**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW MEXICO**

ANORA P.,

        **Plaintiff,**

       **v.**                                       **Civ. No. 24-1270 MLG/GJF**

FRANK J. BISIGNANO, Commissioner
Of the Social Security Administration,[1]

        **Defendant.**

**<u>PROPOSED FINDINGS AND RECOMMENDED DISPOSITION</u>**

This civil action arises under Title II or Title XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 401-33, for review of the final decision of the Commissioner of Social Security Administration (the "Commissioner" or "Defendant") denying the applications for Disability Insurance Benefits and Supplemental Security Income filed by Plaintiff. The Court has reviewed *Plaintiff's Opening Brief* [Dkt. No. 12] along with Defendant's brief in response [Dkt. No. 21], and Plaintiff's reply [Dkt. No. 22]. After reviewing the briefing, the Administrative Record ("AR") [Dkt. No. 7], and applicable case law, this court recommends that the presiding judge AFFIRM the Commissioner's decision.

## I.    BACKGROUND

Born in January 1991, Plaintiff was 25 years old on the alleged disability onset date of January 1, 2017. *See* Administrative Record ("AR"), Dkt. No. 7, at 104; Dkt. No. 12 at 3. She has a high school education and reported completing one year of college. *Id.* On February 4, 2021, she filed both a Title II application for disability and disability insurance benefits as well as a Title XVI

---

[1] Commissioner Bisignano was sworn in as Commissioner of the Social Security Administration on May 7, 2025; thus, pursuant to Federal Rule of Civil Procedure 25(d), he is "automatically substituted as a party."

application for supplemental security income. AR 387-411. On June 25, 2021, the SSA denied Plaintiff's claims. AR 5-20. She moved for reconsideration [AR 151], and on February 23, 2023, the SSA denied that motion as well. AR 21-82, 152-164. Plaintiff filed a written request for hearing before an administrative law judge ("ALJ"). AR 166-168. The ALJ held both a hearing via videoconference on December 11, 2023 [AR 231, 306-340], and a supplemental videoconference hearing on June 11, 2024. AR 265, 341-383.

On July 11, 2024, the ALJ issued his written decision finding that Plaintiff is not disabled. AR 88-112. Plaintiff appealed the ALJ's decision. AR 296-298. On October 15, 2024, the Appeals Council denied Plaintiff's request for review. AR 113-119. On December 18, 2024, Plaintiff filed her Complaint [Dkt. No. 1] in this case.

## II.    STANDARD OF REVIEW

### A.  Sequential Evaluation Process

To qualify for disability benefits, a claimant must establish the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). To evaluate claims for benefits, the SSA uses a five-step sequential evaluation process. *Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). At the first step, the claimant must show that she is not "presently engaged in substantial gainful activity." 20 C.F.R. § 404.1520(b) and 416.920(b). If so, at step two the claimant must demonstrate that she has a medically severe impairment or combination of impairments that is severe. 20 C.F.R. § 404.1520(c) and 416.920(c). An impairment or combination of impairments is severe if it significantly limits an individual's ability to perform basic work activities. If the claimant satisfied step two, then at step three the ALJ must determine whether the impairment or

combination of impairments is severe enough to both satisfy the criteria of a listed impairment and meets the duration requirement. If the claimant satisfies this step, she is disabled. If not, then the analysis proceeds to the fourth step.

Before considering step four, however, the ALJ must first determine the claimant's residual functional capacity ("RFC"). 20 C.F.R. § 404.1520(e) and 416.920(e).

At step four, the claimant must show that "the impairment or combination of impairments prevents [her] from performing his past work." *Williams v. Bowen*, 844 F.2d 748, 750-51, 751 n.2 (10th Cir. 1988); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005). If the claimant has the RFC to do her past relevant work, the claimant is not disabled. If she is unable to do any past relevant work or does not have any such work, the analysis proceeds to the fifth step.

As previously noted, the claimant bears the burden of proof at steps one through four.[2] *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Grogan*, 399 F.3d at 1261; *Williams*, 844 F.2d at 750-51, 751 n.2. If the claimant reaches step five, however, the burden shifts to the Commissioner to show that the claimant retains sufficient capacity "to perform other work in the national economy in view of [her] age, education, and work experience." *Yuckert*, 482 U.S. at 142, 146 n.5. To support a finding that an individual is not disabled at this step, the Social Security Administration must show that other work exists in significant numbers in the national economy that the claimant can do in light of her RFC, age, education, and work experience. If the claimant is able to do other work, she is not disabled.

### B. Substantial Evidence

Judicial review of the ALJ's five-step analysis and ultimate decision is both legal and

---

[2] Specific to this case, Plaintiff "has the burden at step three of demonstrating, through medical evidence, that her impairments 'meet all of the specified medical criteria' contained in a particular listing." *Riddle v. Halter*, 10 Fed. Appx. 665, 666–67 (10th Cir. 2001) (quoting *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

factual. *See, e.g.*, *Maes v. Astrue*, 522 F.3d 1093, 1096 (10th Cir. 2008) ("The standard of review in a social security appeal is whether the correct legal standards were applied and whether the decision is supported by substantial evidence."). If the ALJ applied the correct legal standards and supported his findings with substantial evidence, the Commissioner's decision stands. *See Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004).

In determining whether the ALJ applied the correct legal standards, the Court evaluates whether the ALJ "followed the specific rules of law" required for "weighing particular types of evidence in disability cases[.]" *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (internal quotation marks omitted) (quoting *Hackett v. Barnhart*, 395 F.3d 1168, 1172 (10th Cir. 2005)). The Court may reverse or remand if the ALJ failed to "apply correct legal standards" or "show . . . [she] has done so[.]" *Hamlin*, 365 F.3d at 1214.

The Commissioner's factual findings, on the other hand, are presumed conclusive so long as substantial evidence supports them. 42 U.S.C. § 405(g). Under this standard, "a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102-03 (2019) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "[T]he threshold for such evidentiary sufficiency is not high. Substantial evidence, [the Supreme] Court has said, is more than a mere scintilla." *Id.* at 103 (quotation omitted). On the other hand, substantial evidence is less than a preponderance. *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009). Substantial evidence means only such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek*, 587 U.S. at 97, 103 (quotation omitted).

Under this substantial evidence standard, a court cannot convert its meticulous review of

the full record into "reweigh[ing of] the evidence nor substitut[ing] [the court's] judgment for that of the agency." *Newbold v. Colvin*, 718 F.3d 1257, 1262 (10th Cir. 2013) (quotation omitted); *Hamlin*, 365 F.3d at 1214. Indeed, a court is to "review only the *sufficiency* of the evidence, not its weight." *Oldham v. Astrue*, 509 F.3d 1254, 1257 (10th Cir. 2007) (emphasis in original). Thus, "[t]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." *Lax*, 489 F.3d at 1084 (quotation omitted). Consequently, a court "may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." *Id.* (quotation and brackets omitted).

### III.    ALJ'S DECISION AND FINDINGS

At step one, the ALJ found that Plaintiff has not engaged in substantial gainful activity since January 1, 2017, the claimed date of onset of her disability. AR 91. At step two, the ALJ found that Plaintiff has several medically severe impairments that significantly limit her ability to perform basic work activities. AR 91. They include: borderline personality disorder, chronic post-traumatic stress disorder ("PTSD"), obsessive-compulsive disorder ("OCD"), dissociative identity disorder with psychotic features, major depression (recurrent and severe), depersonalization/derealization disorder, unspecified neurocognitive disorder, and prolonged grief disorder. *Id.*

At step three, the ALJ concluded that these impairments or combination of impairments are not severe enough to both satisfy the criteria of a listed impairment and to meet the duration requirement. AR 92. The ALJ considered the impairments singly and in combination under the criteria of listings 12.02, 12.03, 12.04, 12.06, 12.08, 12.11, and 12.15. *Id.* First, the ALJ considered whether the "paragraph B" criteria were satisfied due to the mental impairments causing one extreme limitation or two marked limitations in one of four broad areas of mental functioning. The

ALJ found that Plaintiff has a moderate limitation in all four—that is, understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. AR 93. Because Plaintiff did not have at least two "marked" limitations or one "extreme" limitation, the ALJ found that the "Paragraph B" criteria were not satisfied. As for the "Paragraph C" criteria, the ALJ stated:

> A psychologist who testified at the hearing as a medical expert said whether the claimant met the subsection one criterion of the paragraph was hard to gauge, acknowledging that was finding [sic] the claimant did not meet that subsection was not wrong. More importantly, the claimant's treatment during the period at issue consisted of outpatient counseling therapy alone. She was able to live in the community, initially with her husband and later with a partner, despite receiving only outpatient therapy. . . [S]he able [sic] to plan and participate in interstate trips, go on a date, and make money by "video camming," crocheting, and even posing for a painting. The breadth of these activities and the financially goal-driven activities does not show the claimant has a minimal capacity to adapt to changes in environment or to demands that are not already part of the claimant's daily life as would satisfy the paragraph C criteria. It does not show that simple changes or increased demand have led to a deterioration of the claimant's functioning or inability to function outside the home.

AR 93-94.

Next, the ALJ evaluated Plaintiff's RFC, acknowledging that (1) the limitations identified in the Paragraph B criteria are not an RFC assessment but rather are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process, and (2) the mental RFC assessment requires a more detailed assessment of the areas of mental functioning. AR 94. Ater reviewing the evidence, the ALJ concluded that Plaintiff has the RFC "to perform a full range of work at all exertional levels" but with certain limitations. *Id.* Those limitations include the ability to "understand, remember, and carry out only simple instructions; maintain attention and concentration for no longer than two-hour blocks of time; occasionally interact with supervisors, co-workers, and the general public; use judgment to make only simple work-related decisions;

perform only occasional production rate work (assembly line/hourly quota work); and tolerate only occasional changes in the work setting." *Id.*

At step four, the ALJ concluded that Plaintiff has no relevant past work. AR 103. Finally, at step five, the ALJ found that considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that she can perform. AR 104. These include laundry aide (cleaner, hospital), order picker, and industrial cleaner. *Id.* Accordingly, the ALJ found that Plaintiff is not disabled within the meaning of section 204.00 in the Medical-Vocational Guidelines. AR 105.

## IV.    PLAINTIFF'S CONTENTIONS

Plaintiff alleges that the ALJ committed reversible error in two ways. First, she alleges that the ALJ misinterpreted a medical expert's opinion and then used that misinterpretation to find that Plaintiff did not satisfy a Listing in step three of the sequential evaluation process.

Second, she asserts that the ALJ committed reversible error at step three by inadequately explaining why he rejected opinions by (1) Ms. Lichtle and Dr. LaCourt, who wrote a report regarding Plaintiff's mental status examination, and (2) Dr. Wynne, Plaintiff's treating psychologist. Dkt. No. 12 at 1, 18, and 21.

## V.    DISCUSSION

### A.  The ALJ Did Not Use a Misinterpretation of Dr. Heath's Opinion to Find that Plaintiff Did Not Satisfy a Listing

As previously noted, the ALJ concluded that Plaintiff satisfied none of the listed impairments. As part of that analysis, the ALJ stated that the evidence failed to establish the necessary presence of "paragraph C" criteria. AR 93-94. Plaintiff challenges that conclusion as to Listing 12.04, which relates to depressive, bipolar and related disorders. *See* 20 C.F.R. Pt. 404,

Subpt. P, App'x 1, § 12.04; Dkt. No. 12 at 12. According to Plaintiff, the ALJ should have found that Listing 12.04 is met and that she is disabled.

In order to satisfy paragraph C, however, a plaintiff must show as a threshold matter that she has a medically documented history of a serious disorder over a period of at least two years. The parties agree that this requirement is satisfied. Dkt. No. 12 at12; Dkt. No. 21 at 5. Then, in order to satisfy the remainder of paragraph C, Plaintiff must prove both (1) the presence of medical treatment, mental health therapy, psychosocial support, or a highly structured setting that is ongoing and that diminishes the symptoms and signs of the mental disorder, and (2) minimal capacity to adapt to changes in the claimant's environment or to demands that are not already part of the claimant's daily life. 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.04. The ALJ concluded that Plaintiff did not satisfy either requirement; Plaintiff argues the ALJ misinterpreted the medical testimony. The Court addresses each subpart of Paragraph C in turn.

1. *Presence of medical treatment, mental health therapy, psychosocial support, or a highly structured setting that is ongoing and that diminishes the symptoms and signs of the mental disorder*

In discussing this requirement, the ALJ referred to the hearing testimony of Dr. Heath, a consulting psychologist who reviewed Plaintiff's medical records and other documentation and testified as an expert at the hearing. AR 348-349. Plaintiff asserts that the ALJ mischaracterized Dr. Heath's testimony when he concluded that Plaintiff did not meet this requirement.

Dr. Heath's testimony was not a model of clarity. Initially, Dr. Heath implied that Plaintiff may satisfy the paragraph C criteria. When the ALJ asked Dr. Heath if Plaintiff met any of the 12.00 listings, Dr. Heath stated,

> I don't—I wouldn't think it's a stretch to go 12.04. We had really the nice listing of symptoms in the consultative evaluation . . .and then again rather than even need

> to debate the B Criteria, you could jump to the C Criteria where she's clearly received treatment from Dr. [Wynne] for kind of an extended period of history, you know, it seems that she's had a number of jobs for some sort [sic] time, been able to hold things, you know, some elements of life were reasonably together. We could probably say that's you know, somewhat diminishing. Hopefully doing better than she would be without that therapeutic support but not as, you know, not great. I'd rather look to the C than the B Criteria.

AR 363-64. Later in his testimony, the ALJ revisited the paragraph C requirements regarding Listing 12.04, asking Dr. Heath to look "at paragraph one specifically, medical treatment, mental health therapy, psychosocial support, or a highly structured setting that is ongoing and that diminishes the symptoms and signs of a mental disorder, is that present?" AR 372. In response, Dr. Heath made this ambiguous statement:

> *Hard to gauge* that. I think that's when we have to debate. I think on the point he was making is, you know, still seeing very big, big struggles, but again we have instances of, you know, renewed relationships, so, you know, financially goal-driven activities. So there is some adequate functioning, you know, I may like to say does better with therapy than without it. That one I feel like is unfortunately *not as clearly definable*. Does it diminish the signs and symptoms? Does it not? It's very difficult to say, you know, and in some ways starts to conflict with #2, right, marginal adjustment. How does it diminish if there's marginal adjustment? It still appears like there's, you know, notable deficits or prominent psychological symptoms, distress, I would say. . . . But, you know, given the time that she goes to see certainly Dr. [Wynne, Plaintiff's treating psychologist] I would like to think that, you know, she continues to go there because it diminishes symptoms or helps her in a way that otherwise she would not be experiencing amelioration, you know we take medicine because it alleviates symptoms. I, you know, in psychotherapy, people vote with their feet. I presume that's why she continues to go back is she finds it helpful.

AR 372-73 (emphasis added). In response, the ALJ repeated, "So you said as far as C1, paragraph C1, it's hard to gauge. It's not clearly definable." Dr. Heath responded, "It is." AR 373. Then the ALJ stated, "So, based upon that, I'm finding that specific paragraph is not met." Dr. Heath responded, "Okay. I don't think it's wrong." AR 373-74.

When discussing the paragraph C(1) requirement in his Decision, the ALJ stated that, "A psychologist [Dr. Heath] who testified at the hearing as a medical expert said whether the claimant met the subsection one criterion of the paragraph was hard to gauge, acknowledging that was [sic] finding the claimant did not meet that subsection was not wrong." AR 93. *See also* AR 102 ("While the doctor noted that the paragraph C subsection one criterion concerning diminishment of symptoms was hard to gauge, he acknowledged that he did not disagree with a finding that the criterion was not met."). According to Plaintiff, the ALJ mischaracterized Dr. Heath's testimony because in Plaintiff's view, Dr. Heath testified at AR 363-364 that Plaintiff had met the criteria for Listing 12.04 under the paragraphs A and C criteria. Dkt. No. 12 at 14.

The Court disagrees with Plaintiff and concludes that the ALJ did not mischaracterize Dr. Heath's testimony. Rather, the ALJ is correct that, although Dr. Heath initially implied vaguely that Plaintiff might satisfy paragraph C(1), in the end he opined that it would not be incorrect to conclude that the paragraph C(1) factors are not met in this case. At first, Dr. Heath suggested that Plaintiff might satisfy Listing 12.04, although he did not state a strong opinion. He clearly acknowledged Plaintiff's long history of treatment by Dr. Wynne, but as to whether the treatment has diminished the signs and symptoms of her disorder, Dr. Heath was far from definitive. He stated, "We could *probably* say that's, you know, *somewhat* diminishing." AR 364 (emphasis added). Dr. Heath followed that with the noncommittal statement, "*Hopefully* doing better than she would be without that therapeutic support." *Id.* And then later, when the ALJ returned to the paragraph C(1) requirement, Dr. Heath called it "hard to gauge," AR 372, "very difficult to say," AR 373, and "not clearly definable." *Id.* Dr. Heath posed several rhetorical questions, such as, "Does it diminish the signs and symptoms? Does it not?" and, "How does it diminish if there's marginal adjustment?" These further add to the ambiguity of his testimony. AR 373. Then Dr.

Heath said that he "would like to think" that Plaintiff continues seeing Dr. Wynne because it diminishes her symptoms or helps her, but he stopped short of opining that this is actually the case. *Id.* Then, when the ALJ stated that he intended to find that paragraph C(1) is not met, Dr. Heath said, "OK. I don't think it's wrong." AR 373-74. The Court construes this exchange as Dr. Heath agreeing with the ALJ that Plaintiff does not meet the paragraph C(1) criteria.

Plaintiff argues that the ALJ erred because "the ALJ is not able to rewrite the regulations or decide on his own that a listing's criteria are simply undefinable and therefore the listing is not met." Dkt. 12 at 15. However, that is not what the ALJ d*Id.* A careful reading of the testimony shows that it was *Dr. Heath* who first stated that it was hard to gauge *whether the paragraph C(1) criteria were met*, and that while he "may like to say" that Plaintiff "does better with therapy than without it," "that one I feel like is unfortunately not as clearly definable." AR 373. In the Court's view, it appears that Dr. Heath is saying that it is not clear to him that Plaintiff satisfies the criteria. Only after Dr. Heath says that it is "not as clearly definable" does the ALJ repeat back Dr. Heath's own words such as "hard to gauge" and "not clearly definable" as grounds to find that paragraph C(1) criteria are not met. This is not an attempt by the ALJ to rewrite the regulations.

Next, Plaintiff asserts that it is "unclear whether Dr. Heath is saying that he does not think the criteria are wrong or that he does not think the ALJ is wrong." Dkt. No. 12 at 15-16. Again, the Court disagrees. The ALJ states what his finding will be, and Dr. Heath says, "I don't think it's wrong." The Court does not find this to be ambiguous. Finally, Plaintiff argues that whatever Dr. Heath may have meant by, "I don't think it's wrong," his testimony both before and after that statement indicate that he believed that Listing 12.04 was met. Dkt. No. 12 at 16. For all the reasons previously discussed in Part V(A)(1) of this opinion, however, the Court rejects that interpretation of Dr. Heath's testimony.

11

In sum, the ALJ did not misconstrue Dr. Heath's testimony regarding the paragraph C(1) criteria, and his decision on this issue is supported by substantial evidence.

   2. *Minimal capacity to adapt to changes in the claimant's environment or to demands not already part of her daily life*

With regard to the Paragraph C(2) requirement of marginal adjustment, Plaintiff makes a two-pronged argument. Dkt. No. 12 at 17. First, she contends that the Court must remand because the ALJ claimed to rely on Dr. Heath's opinion regarding whether a listing is met but did not adopt his conclusion that Listing 12.04 is met. *Id.* Second, she argues that the ALJ erroneously relied on extraneous factors not enumerated in the Paragraph C(2) criteria. *Id.*

Starting with Plaintiff's first argument in which she claims that Dr. Heath testified that she satisfied Paragraph C(2), Plaintiff points out that Dr. Wynne, her treating psychologist, stated that Plaintiff had been able to work for only a few months before becoming overwhelmed by work requirements. Dkt. No. 12 at 13 (citing AR 717). Plaintiff cites to portions of Dr. Heath's testimony in which he mentions her "very big, big struggles," "notable deficits," and "multiple instances [of] not coping with stress well," as support for her contention that Paragraph C(2) is satisfied. *Id.* (citing AR 373-74, 377). Plaintiff also acknowledges, however, that Dr. Heath was "equivocal" about whether she could handle work demands, but he did not directly disagree with Dr. Wynne. Dkt. No. 12 at 13. She contends that these statements by Drs. Wynne and Heath all suggest that Paragraph C(2) is met. *Id.* at 13-14.

As with his testimony on the Paragraph C(1) factors, Dr. Heath's testimony on the Paragraph C(2) factors was unclear. When asked if a person with Plaintiff's limitations could sustain work for any length of time, have regular attendance, and be punctual within the normal work-related setting, Dr. Heath responded,

And is it—again, I pose the caveat, difficult to speculate, you know, no instances—
I believe she said I've never been fired from a job for anything but, you know,
multiple instances not coping with stress well. If somebody was, you know,
routinely having panic attacks or things like that, you know, then certainly I guess
that would make it difficult, you know, to perform the functions, right. They may
not be able to get out of the house at times. Again, if they can't drive, you know.
And in contrast, again, to give the other side of it though, you know, the medical
record from 18F—that's the—I believe the nurse practitioner who said, you know,
she'd likely benefit from one of these mood stabilizers. These have decent
effectiveness. You wouldn't want to penalize someone for saying, hey, I don't want
a medication, I prefer, you know, therapy. But you know, to your point I guess it
depends to what level of treatment maybe they have. There could be some number
of things influencing.

AR 377-78.

This testimony is ambiguous at best, as it is far from clear what, if anything, Dr. Heath was trying to say about Plaintiff's ability to regularly attend work over a sustained period of time. The Court disagrees with Plaintiff's contention that the ALJ misunderstood Dr. Heath's testimony; in fact, Dr. Heath appears to have been working hard to avoid stating anything definitive about whether Plaintiff has the ability to adapt to changes in her environment or demands outside her normal daily life. Further, the Court rejects the assertion that Dr. Heath concluded that Plaintiff satisfied Listing 12.04. The Court has already addressed and discarded that argument in Part V(A)(1), *supra*, of this opinion. Finally, noting that Plaintiff has "very big, big struggles," "notable deficits," and "multiple instances [of] not coping with stress well," is a far cry from concluding that Plaintiff has satisfied the Paragraph C(2) requirements. The ALJ did not misinterpret Dr. Heath's testimony.

Plaintiff's second argument for remand is that the ALJ erroneously applied factors outside the C(2) criteria when he noted that her "treatment during the period at issue consisted of outpatient counseling and therapy alone," that she was able to go out and "able to live in the community," and she was able to make money by filming herself nude. *Id.* at 16. According to Plaintiff, her

13

intermittent trips for recreation (such as traveling out of state for a concert or birthday) and filming herself online for money do not bear on whether she can adjust to changes in environment or new demands. *Id.* at 16-17.

To evaluate Plaintiff's argument, the Court turns to 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(G)(2)(c), which explains that Paragraph C(2) is satisfied when, despite the claimant's diminished symptoms and signs as described in C(1), the claimant still has only marginal adjustment. The regulation then explains that marginal adjustment

> means that your adaptation to the requirements of daily life is fragile; that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life. We will consider that you have achieved only marginal adjustment when the evidence shows that changes or increased demands have led to exacerbation of your symptoms and signs and to deterioration in your functioning; for example, you have become *unable to function outside of your home* or a more restrictive setting, *without substantial psychosocial supports* (see 12.00D). Such deterioration may have *necessitated a significant change in medication or other treatment*. Similarly, because of the nature of your mental disorder, evidence may document episodes of deterioration that have *required you to be hospitalized* or absent from work, making it difficult for you to sustain work activity over time.

 (emphasis added). Therefore, the regulation makes it clear that the ALJ did not err by considering that Plaintiff's care had never deviated from outpatient counseling and therapy alone, because one factor to consider under the regulation is whether Plaintiff had required a significant change in treatment as a result of her inability to adapt to the requirements of daily life. Here, Plaintiff continued the same treatment approach even when attempting to work outside her home. Later in his opinion, the ALJ noted that Plaintiff had made several types of changes to her daily life, including planning, paying for, and participating in two out of state trips for a family party and a concert; going on a date; and engaging in activities for money (mostly filming herself), which did not appear to exacerbate her symptoms or spur a change in treatment. AR 94, 96. The ALJ

described this as evidence that Plaintiff was able to participate "in activities outside her home and engagement in goal-directed activities and interaction with others." AR 96. This is substantial evidence supporting the ALJ's conclusion that the Paragraph C(2) factors are not satisfied. *See Fischer-Ross v. Barnhart*, 431 F.3d 729, 733 (10th Cir. 2005) (holding that "an ALJ's findings at other steps of the sequential process may provide a proper basis for upholding a step three conclusion that a claimant's impairments do not meet or equal any listed impairment). That being the case, Court will not reweigh the evidence that was before the ALJ.

### B. The ALJ Adequately Explained Why He Rejected Medical Opinions by Ms. Lichtle and Dr. LaCourt and by Dr. Wynne

Plaintiff alleges that the ALJ erred in concluding that two medical opinions were not persuasive. The first is the consultative mental status report from October 2022 written by psychologist associate Ms. Kris Lichtle and cosigned by Dr. David LaCourt, a rehabilitation psychologist. The ALJ rejected their opinion that Plaintiff has marked limitations in four areas of mental functioning. The second is the opinion of Dr. Wynne, Plaintiff's treating psychologist. The ALJ found unpersuasive Dr. Wynne's opinion that Plaintiff could not maintain regular attendance and punctuality at work, sustain an ordinary routine, or complete a normal workday or workweek without interruptions from symptoms, such that she is precluded from regular and continuing work activity.

#### *(1) Standard of Review*

In evaluating the persuasiveness of medical opinions, an ALJ must consider five factors: (1) supportability; (2) consistency; (3) relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors. 20

15

C.F.R. § 404.1520c(c). Of these, the regulations require the ALJ to discuss only supportability and consistency. 20 C.F.R. §§ 404.1520c(b)(2) and 416.920c(b)(2). The ALJ need only provide information to allow the court to "trace the path of the adjudicator's reasoning." *Nielsen v. Comm'r, SSA*, No. 21-4136, 2022 WL 15570650 at *2 (10th Cir. Oct. 28, 2022).

Supportability—the first factor in determining persuasiveness of a medical opinion— examines how closely connected a medical opinion is to the evidence and the medical source's explanations. "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s), the more persuasive the medical opinions will be." 20 C.F.R. § 404.1520c(c)(1). "Objective medical evidence means signs, laboratory findings, or both." 20 C.F.R. § 404.1502(f).

Consistency—the second factor in determining persuasiveness of a medical opinion— compares a medical opinion to the evidence. "The more consistent a medical opinion(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) will be." § 404.1520c(c)(2).

> [O]ur use of the word "consistent" in the regulations is the same as the plain language and common definition of "consistent." This includes consideration of factors such as whether the evidence conflicts with other evidence from other medical sources and whether it contains an internal conflict with evidence from the same medical source. We acknowledge that the symptom severity of some impairments may fluctuate over time, and we will consider the evidence in the claim that may reflect on this as part of the consistency factor as well. Thus, the appropriate level of articulation will necessarily depend on the unique circumstances of each claim.

Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5854 (Jan. 18, 2017) (emphases added).

In explaining how persuasive a medical opinion is, each of the ALJ's findings must be supported by substantial evidence. "[A]ll the ALJ's required findings must be supported by substantial evidence, and he must consider all relevant medical evidence in making those findings." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005) (citations and quotation marks omitted). The ALJ must provide "sufficient specificity to enable the reviewing court to decide whether the determination is supported by substantial evidence." *Harp v. Kijakazi*, No. 21-cv-00275-KRS, 2022 WL 2341740, at *6 (D.N.M. June 29, 2022) (quotation omitted). Finally, judicial review is limited to the reasons stated in the ALJ's decision. *Carpenter v. Astrue*, 537 F.3d 1264, 1267 (10th Cir. 2008) (citation omitted).

### (2) Dr. LaCourt and Kris Lichtle

As previously noted, Dr. LaCourt and Ms. Lichtle opined (Ex. 16F, AR 663-69) that Plaintiff had marked limitations in numerous areas of mental functioning, to include understanding and remembering detailed/complex instructions; sustained concentration/task persistence for carrying out instructions, attending and concentrating, and working without supervision; social interaction with the public, co-workers, and supervisors; adapting to changes in the workplace and awareness of normal hazards; and use of public transportation/travel to unfamiliar places. AR 669. A marked limitation is defined as a "seriously limited" ability to function in the area in that manner. *See* 20 C.F.R. Pt. 404, Subpt. P, App's 1 § 12.00(F)(2). Dr. LaCourt and Ms. Lichtle also opined that Plaintiff's memory issues prevented her from managing her own benefits. But the ALJ rejected the opinion, finding it unpersuasive. *See* AR 101 (citing Ex. 16F, AR 663-69). The ALJ listed evidence in the record that he found to be inconsistent with their opinion. He noted that Plaintiff presented with clean clothes, normal grooming and hygiene, appropriate eye contact, and no evidence of untoward preoccupations or hallucinations. AR 101. He noted that their report states

17

that Plaintiff's memory and recall were intact, and she scored in the average range on intelligence testing. The ALJ stated that the foregoing are "not demonstrative of marked limitations." *Id.* Finally, he noted that "marked limitations are inconsistent with activities involving planning and task completion such as crocheting, with planning and participation in trips to Utah and Phoenix, and with the claimant's conservative treatment." *Id.*

Plaintiff argues that, as to the supportability factor, the ALJ failed to acknowledge any evidence that supported Dr. LaCourt and Ms. Lichtle's opinion that she has a marked limitation in all four areas of mental functioning. Dkt. No.12 at 19-20. These include "impaired" memory scores[3], Plaintiff's "obsessive" thoughts dwelling on whether she locked the door at home[4], her increase in anxiety over testing, or her own self-reported history of trauma and abuse as well as symptoms that led to the diagnoses of PTSD and depersonalization/derealization disorder. *Id. See also* AR 668.

The Court finds that the ALJ did not err in his supportability analysis. The ALJ concluded that Dr. LaCourt and Ms. Lichtle's opinion that Plaintiff has marked limitations was not supported by their own mostly normal examination findings. Normal exam findings are a valid reason to find that supportability is not met. *Toledo v. Comm'r, SSA*, 2024 WL 4357913 at *3 (10th Cir. Oct. 1, 2024). The Court also finds that Plaintiff's description of some of Dr. LaCourt and Ms. Lichtle's findings to be slightly exaggerated—they did <u>not</u> describe Plaintiff as being "obsessive" about the locked door, for example. Furthermore, the Court notes that while Plaintiff complains that the ALJ

---

[3] The report states that Plaintiff's "Auditory Memory, Visual Working Memory, Immediate Memory, and Delayed Memory are in the Borderline/Below Average range. Visual Memory is in the Average range." AR 668. It is not clear to the Court that this indicates a memory that is "impaired." On the other hand, the report also states that Plaintiff cannot manage her own benefits due to "significant memory issues." AR 669.

[4] Dr. LaCourt and Ms. Lichtle did not characterize Plaintiff's thoughts about the door as "obsessive." Instead, the report merely states, "She mentioned several times during her office visit that she was not sure that she locked the door to her home." AR 666.

engaged in cherry-picking, Plaintiff does not explain how the evidence in the report that the ALJ did not cite, such as clinical findings of Borderline/Below Average memory, an increase in anxiety over intelligence and memory tests in the office, and her marked history of trauma, abuse, and PTSD, support a finding of marked limitations by showing that Plaintiff has a "seriously limited" ability to function. 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00(F)(2)(d).

Plaintiff complains that the ALJ engaged in impermissible "cherry picking," citing three cases. *See* Dkt. No. 12 at 20-21. The cases she cites, however, predate the use of the current regulations regarding the factors the ALJ should consider and the requirement to discuss supportability and consistency. Thus, those cases are not particularly persuasive. Here, the Court can trace the path of the ALJ's reasoning, which is all that is required.

As to the consistency factor, the ALJ noted that Dr. LaCourt and Ms. Lichtle's conclusion that Plaintiff had various marked limitations was "inconsistent with activities involving planning and task completion such as crocheting, with planning and participation in trips to Utah and Phoenix, and with the claimant's conservative treatment." AR 101. In this sentence, the ALJ was referring to evidence he discussed earlier in his opinion that showed that Plaintiff planned for, paid for, and traveled to her grandmother's birthday in Utah in August 2022, just a couple of months before Dr. LaCourt and Ms. Lichtle evaluated her. AR 96, 664. Plaintiff also bought tickets for a concert in Phoenix for a concert a year later, traveling there by car with other people. AR 96. The ALJ noted that "[t]hese trips give a reasonable inference of a capacity for planning and execution of goal-directed activities outside her home that is not consistent with allegations of a need for significant supervision or with a confined lifestyle due to symptoms. They also reasonably infer an ability to function successfully in groups . . . " AR 96-97. As for crocheting, the ALJ discussed that Plaintiff had made a shawl as a gift for her grandmother and created items to earn money,

19

which the ALJ found to be inconsistent with an inability to initiate, persist at, and complete tasks. AR 97. The ALJ also cited Plaintiff's steady yet conservative outpatient counseling therapy over a period of years as further evidence that Plaintiff does not have marked limitations requiring greater intervention. AR 97. In other words, the ALJ weighed evidence of Plaintiff's activities outside the clinical setting and found it more persuasive than the opinion set forth by Ms. Lichtle and Dr. LaCourt.

Plaintiff argues that the ALJ's consistency analysis is inadequate because he failed to acknowledge the consistency between Dr. LaCourt and Ms. Lichtle's opinion regarding marked limitations and the opinion offered by Dr. Wynne, her treating psychologist. Dkt. No. 22 at 8. She also argues that the ALJ should have considered that a screening by an examining psychiatric nurse practitioner indicated severe depression and anxiety, and that all treating and examining providers agreed that Plaintiff has a severe trauma history that has produced depersonalization Dkt. No. 12 at 20 (citing AR 544-45, 590, 594, 602-03, 717). Once again, Plaintiff accuses the ALJ of "cherry-picking" evidence.

By characterizing the ALJ's analysis as "cherry-picking," Plaintiff is essentially asking the Court to reassess the credibility and weight of the evidence, thereby reweighing the evidence that was properly before the ALJ in the process. *See Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) ("In reviewing the ALJ's decision, 'we neither reweigh the evidence nor substitute our judgment for that of the agency."

It would have been preferable for the ALJ to make more extensive supportability and consistency findings when discussing the findings of Dr. LaCourt and Ms. Lichtle, but the ALJ's written decision adequately explains the ALJ's reasoning for rejecting their opinions. *See Keyes-Zachary v. Astrue*, 695 F.3d 1145 (10th Cir. 2012) ("Where, as here, we can follow the

20

adjudicator's reasoning in conducting our review and can determine that correct legal standards have been applied, merely technical omissions in the ALJ's reasoning do not dictate reversal").

Accordingly, the Court concludes that the ALJ's determination as to the persuasiveness of the opinion is supported by substantial evidence.

*(3) Dr. Wynne*

As discussed above, Plaintiff's treating psychologist, Dr. Wynne, diagnosed Plaintiff with dissociative identity disorder and noted a host of other symptoms, including but not limited to anhedonia, inappropriate affect, mood disturbance, difficulty thinking or concentrating, and hallucinations or delusions. AR 549-558. Dr. Wynne concluded that Plaintiff could not work because she cannot maintain regular work attendance and punctuality, sustain an ordinary routine, complete a normal workweek, perform at a consistent pace, or deal with normal work stress.

As grounds for finding these limitations unpersuasive, the ALJ noted that while Dr. Wynne's notes mentioned Plaintiff's unpleasant odor and that Plaintiff rarely showered, the ALJ cites notes from Dr. Wynne mentioning issues with running water at Plaintiff's residence that could imply other reasons for limited bathing. AR 102, 682, 686. The ALJ acknowledged that Dr. Wynne's treatment notes do mention signs of psychotic symptoms, but he pointed out that psychotic behavior was not mentioned by any other providers in different treatment settings. AR 102 (citing treatment records by Desiree Provencio, CNP; Tamara Saimons, CNP; and Dr. David LaCourt). Finally, he pointed out that Dr. Wynne's clinical notes refer to Plaintiff's anticipation of and preparation for trips to Utah and Phoenix, which show broader mental abilities than Dr. Wynne's opinion suggests. AR 102. Finally, the ALJ again cited Plaintiff's long-term treatment with counseling only (no hospitalizations or medications) and that she denied having anxiety,

depression, and fatigue at primary care visits. For these reasons, the ALJ concluded that Dr. Wynne's opinion of Plaintiff's severe restrictions is not persuasive.

With regard to supportability, Plaintiff argues that the ALJ has failed to conduct a supportability analysis, but rather argued "against additional limitations that could have been included based on Dr. Wynne's treatment notes rather than what Dr. Wynne said her limitations actually were." Dkt. No. 12 at 25. The Court disagrees, finding that the ALJ did conduct a supportability analysis. The ALJ relied on several facts from Dr. Wynne's own notes in concluding his opinion was not supportable. First, he noted that Plaintiff was sometimes malodorous, but Dr. Wynne's notes also mentioned issues with running water at her home, meaning that Plaintiff's occasional failure to bathe did not necessarily stem from mental health issues. Further, the ALJ looked to Dr. Wynne's clinical notes regarding Plaintiff's "anticipation and preparation" for her trips to Utah for a family birthday and to Phoenix for a concert. The ALJ indicated here, as he did elsewhere in his opinion, that Plaintiff's planning and participation in those events support the conclusion that Plaintiff has more than the minimal mental abilities than Dr. Wynne's opinion suggests.

With regard to consistency, Plaintiff asserts that the ALJ cherry-picked portions of the record and ignored others. Plaintiff asserts that "emphasizing [her] ability to occasionally do things or go places neglects the fact that severe symptomology is a recurrent finding within the record." This is merely a request, however, for the Court to reweigh the competing evidence that was before the ALJ. Plaintiff also asserts that both Plaintiff and Dr. Wynne have observed that she is "at times stable enough to do things like consistently showing up for work, but she eventually destabilizes." Dkt. No. 12 at 22. Plaintiff argues that the ALJ has failed to explain how her ability to "sometimes go out and do recreational activities is inconsistent with Dr. Wynne's opinion." *Id.* The Court

disagrees. As previously discussed with regard to Dr. LaCourt and Ms. Lichtle's opinion, the ALJ pointed out that Plaintiff's activities required planning, preparation, travel, and interactions with others that are inconsistent with a complete inability to function in a work setting, as Dr. Wynne has opined. The ALJ reached the same conclusion here, noting "Dr. Wynne's clinical notes refer to the claimant's anticipation and preparation for the trips to Utah to see family and to Phoenix for a concert." AR 102. Finally, Plaintiff also argues that her long-term, conservative therapy treatment is not wrong, and Dr. Wynne has advised her not to use psychotropic medicines. Dkt. No. 12 at 23 (citing AR 540). That being the case, Plaintiff is not noncompliant with a prescribed treatment, and analysis of the *Frey* factors[5] is unnecessary. Indeed, as Plaintiff points out, different providers have had varying opinions as to the appropriate treatment for Plaintiff. *Id.* at 23. The ALJ simply weighed the fact that Plaintiff's treating doctor does not recommend medications and Plaintiff does not seem to request them, with both preferring psychotherapy alone, as evidence that undermines Dr. Wynne's opinion that her condition was so serious that she is precluded from regular and continuing work activity. Finally, the ALJ concluded that Dr. Wynne's notes mentioning "signs of psychotic symptoms" are not consistent with findings of providers in other examination settings. Plaintiff has not cited records from any other provider who has noted psychotic symptoms.

Accordingly, the Court finds that substantial evidence supports the ALJ's determination that Dr. Wynne's opinion is not persuasive.

---

[5] In *Frey v. Bowen*, the Tenth Circuit identified four factors ALJs must consider when "reviewing the impact of a claimant's failure to undertake treatment" on a disability determination: (1) whether the treatment would restore the claimant's ability to work, (2) whether it was prescribed, (3) whether the claimant refused the treatment, and (4) whether the refusal was justifiable. 816 F.2d 508, 517 (10th Cir. 1987).

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision be **AFFIRMED**, Plaintiff's Motion to Reverse and Remand to Agency [Dkt. No. 12] be **DENIED**, and this case be **DISMISSED WITH PREJUDICE**.

_____
**UNITED STATES MAGISTRATE JUDGE**
*Presiding by Consent*

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1)(c). Any request for an extension must be filed in writing no later than seven days from the date of this filing. **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**